MARTIN ORCHARD COMPANY and others, Appellants, vs. FRUIT GROWERS CANNING COMPANY and others, Respondents.

*November 13—December 9, 1930.*

98

For the appellants there was a brief by *Olwell & Brady* of Milwaukee, and oral argument by *Bernard V. Brady*.

For the respondents there was a brief by *Sanderson & Stapleton* of Sturgeon Bay, and oral argument by *Thomas A. Sanderson*.

WICKHEM, J. The common law governing this controversy is not seriously in dispute. It is clear that a fundamental or radical change in the purposes of a corporation cannot be accomplished by amendment over the dissent of a single stockholder. 7 Ruling Case Law, p. 97. It is equally clear that non-fundamental or immaterial changes may be made by the ordinary procedure of amendment. 7 Ruling Case Law, p. 97. The defendants contend that sec. 180.07 (1), Stats., has changed this rule. This section provides:

"Any corporation organized for any of the purposes authorized by this chapter, may, by a vote of two thirds of all the stock outstanding, and entitled to vote, or one half of the members of a corporation without stock, unless a greater vote shall be required in its articles, amend its articles so as to modify or enlarge its business or purposes, change its name or location, increase or diminish its capital stock, change its officers or its directors, or provide anything which might have been originally provided in such articles, but no corporation without stock shall change substantially the original purposes of its organization. The

amendment shall be adopted only in accordance with the articles, if a mode of amending the same shall have been therein prescribed."

Since the application of the common-law rule above stated to the facts of this case compels a conclusion favorable to the defendants, we have not found it necessary to pass upon, and do not pass upon, the effect of this section.

It is also the law that the majority, even with respect to operations within the powers of the corporation, cannot fraudulently or dishonestly conspire to turn over to themselves corporate property or advantages to the detriment of the corporation itself or a minority of its stockholders. "But where the act of either such body, though lawful in itself, is designed to accomplish some illegitimate object,— the mainspring of the transaction is some ulterior motive,— and the result, if permitted to operate, will be injurious to the corporation or members not concerned in the transaction, such a member may successfully invoke equity jurisdiction for protection of the corporation where the proper officers will not do it." *Theis v. Durr*, 125 Wis. 651, 104 N. W. 985. It is also the law, assuming the corporation to have the power, that the majority, "as to authority lodged with them, and the board of directors in the field where that is the governing body, are supreme within the limits of honest administration and of the boundaries of discretion." *Theis v. Durr, supra.*

This appeal resolves itself into a question of the proper application of these principles to the facts of the case. Did the operations objected to constitute a fundamental and radical change in the corporate activities? If they did not, was the purpose of the new activities so obviously to benefit a majority of the stockholders, and so remotely beneficial to the corporation, that they constituted a violation on the part of the majority of the rights of the minority?

Both questions must be answered in the negative. The defendant was a canning company which depended for its

prosperity and success upon a continuance of satisfactory relations with the Union, and upon the success of the growers of cherries who were marketing their crops through the Union. The Canning Company was not only substantially but vitally concerned with the stability of prices and markets in the cherry industry. It was vitally concerned with maintaining its contract with the Union, which was the only source of a continuous supply of material for packing. By the amendment and the proposed contract it in no wise surrendered its primary business. It was to continue as a canning company, performing the same operations as it did before. The changes adopted were changes in the manner of conducting its business and carrying out its original purposes. The distinction between a fundamental change in purpose and a mere change in the manner of conducting business is pointed out in *Kenosha, R. & R. I. R. Co. v. Marsh,* 17 Wis. 13, 15. While the distinction was made with reference to the right of a subscriber to withdraw, or to resist an action upon a subscription, upon the ground of a fundamental change in the enterprise, it is equally applicable in this situation. The court said:

"The supreme court of Indiana has recently held that the mere consolidation with another company under an act of the legislature releases non-assenting subscribers. *McCray v. Junction R. Co.* 9 Ind. 358; *Booe v. Junction R. Co.* 10 Ind. 93. I should not wish to adopt that conclusion without further examination. For although it may be within the principle of *Hartford & N. H. R. Co. v. Croswell,* 5 Hill, 383, and other cases of a similar character, still there seems to me to be a fair distinction between such changes as only add something to the original enterprise, which becomes tributary to it, and makes its operation more perfect and successful, and changes which abandon the original undertaking for a new one. There is certainly some ground for saying that changes of the former character may be deemed to be fairly within the scope of the original object, as it may reasonably be assumed that every association which undertakes the accomplishment of a particular enterprise

intends to make such changes as experience may show to be necessary for its most successful prosecution. And if this may be assumed, then, although such changes were of course not originally provided for, yet they may fairly be regarded as so far incidental to the original purpose as to be within the scope of the authority which each member has conferred upon the corporation, to bind him by its action whenever the necessary legislative assent is obtained."

While the question of *ultra vires* is not involved in this case, it is worth while to note that courts have been rather generous in construing the articles of incorporation in such a manner as to give, by implication, such powers as are necessary and proper for the carrying out of corporate purposes.

Some idea of the extent to which courts have sustained the implied powers of corporations to adopt improved procedures for meeting new conditions may be had from the following cases: In *Steinway v. Steinway & Sons,* 17 Misc. 43, 40 N. Y. Supp. 718, the power of a corporation to purchase ground for a new factory, build buildings to house its employees, contribute to schools, churches, libraries, and other necessary institutions in the community was sustained on the ground that there was a necessity for meeting the company's labor problems by furnishing proper living conditions and insuring against excessive labor turnover. The court said:

"As industrial conditions change, business methods must change with them, and acts become permissible which at an earlier period would not have been considered to be within corporate power."

In *Heinz v. National Bank of Commerce,* 237 Fed. 942, the power of a corporation to provide pensions for employees was sustained. In the case of *Armstrong Cork Co. v. H. A. Meldrum Co.* 285 Fed. 58, 59, the power of a corporation to contribute to endowment of colleges was sustained, where it appeared that the schools benefited were engaged in creating a class of skilled employees useful in the

business of the corporation. To the same effect see *Evans v. Brunner, Mond & Co.* (1920) 90 L. J. Rep. Ch. Div. 294. In *People ex rel. Metropolitan Life Ins. Co. v. Hotchkiss,* 136 App. Div. 150, 120 N. Y. Supp. 649, the power of an insurance corporation to build a hospital for the treatment of employees suffering from tuberculosis was sustained. In the case of *Fort Worth City Co. v. Smith B. Co.* 151 U. S. 294, 14 Sup. Ct. 339, the power of a real-estate company to contribute to the construction of a bridge across a river which separated its lands from the city was sustained. In *Woods L. Co. v. Moore,* 183 Cal. 497, 191 Pac. 905, the power of a corporation which was engaged in supplying costumes to the producer of a moving-picture film to guarantee producer's bill for lumber necessary to the production of the picture, was sustained. In *Winterfield v. Cream City B. Co.* 96 Wis. 239, 71 N. W. 101, the power of a brewing company to guarantee the rent of a customer was sustained. While these cases, of course, all involve the question of implied powers of corporations, and do not govern this case, they do furnish some evidence of the extent to which courts have gone, without the assistance of corporate amendments, in sustaining new and different activities which tend to promote the original purposes of the corporation.

The requirements for the successful conduct of a business are constantly changing and corporations are faced with the necessity of meeting new conditions or facing obsolescence and ultimate disaster. A manufacturer who yesterday purchased all his raw materials may today find it expedient or necessary to own or control the sources of such materials. The selling methods of yesterday may be wholly ineffective today, and success in manufacturing may depend upon the establishment of retail branches. New requirements of technical skill may call for the expenditure of large sums to endow schools which can offer training of the desired sort. The economic wisdom of preventing a large

labor turnover may call for the institution of various welfare programs calling for the expenditure of large sums. While it is by no means certain that the courts would sustain all projects of this sort under the doctrine of implied powers, it does seem clear, so long as the corporate objective remains the same, and so long as the new activities may be treated merely as improvements in the manner of conducting the business, that no fundamental change will be held to have been attempted by an amendment designed to authorize the new operations. The amendment in this case pledges the assets of the defendant Canning Company in aid of a co-operative scheme which, in the opinion of the majority of the stockholders, and, indeed, of economists generally, offers an effective, and perhaps the only effective, means of protecting and stabilizing the type of industry upon which defendant is dependent for its success. It does not constitute a fundamental change in or departure from the purposes of the defendant company.

Some point is made of the fact that the assets of the Canning Company are to be pledged for a loan many times greater than these assets. However, this loan is also to be secured by the property of the Union and all the property to be acquired in promotion of the scheme, and there is nothing to indicate that the property of the defendant company will be unfairly burdened. Then, too, the corporation can only be liable, in a practical sense, to the extent of the value of its assets.

There is no substantial ground for holding that the proposed scheme constitutes a dishonest or oppressive conspiracy on the part of the majority to injure the rights of the minority. In 7 Ruling Case Law, p. 308, § 283, the rule governing equitable interference is stated as follows:

"The breach of duty by a corporation, authorizing equitable suit by a shareholder for damage in the depreciation of his stock, does not refer to mere mismanagement or neglect of the officers or directors in the control of the cor-

porate affairs, or the abuse of discretion lodged in them in the conduct of the corporation business. To authorize such suit, there must be injurious acts *ultra vires*, fraudulent and injurious practices, abuse of power, and oppression on the part of the corporation or its officers, clearly subversive of the rights of the minority or of a stockholder, and which, without such suit, would leave him remediless. And to warrant the interposition of a court in favor of the minority shareholders as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company, and in a manner inconsistent with its interest."

It is true that a majority of the members of the Union constituted the majority stockholders of the Canning Company. In this situation they doubtless had two interests, one paramount to the other. They were interested as stockholders of the Union and as growers in increased and stabilized cherry prices. As stockholders of the defendant Canning Company they were interested in the success of that organization, the preservation of its capital, and the securing of normal dividends. The first interest doubtless was the stronger of the two. There is no evidence in this case, however, that they unfairly or oppressively secured their paramount interest at the expense of the Canning Company, for it seems quite clear that the Canning Company received a very definite benefit out of the transaction.

There are no facts in the case which bring it within the operation of the rule heretofore stated in Ruling Case Law, or that set out in *Theis v. Durr,* 125 Wis. 651, 104 N. W. 985.

*By the Court.*—Judgment affirmed.