STATE EX REL. CLEARY and others, Plaintiffs, vs. HOPKINS STREET BUILDING & LOAN ASSOCIATION and others, Defendants.

RELIANCE BUILDING & LOAN ASSOCIATION, Respondent, vs. CLEARY and others, Appellants.

NORTHERN BUILDING & LOAN ASSOCIATION, Respondent, vs. SAME, Appellants.

*October 12, 1934—February 5, 1935.*

For Cleary and others connected with the Banking Com-
mission there were briefs by the *Attorney General* and *John*

*E. Martin,* assistant attorney general, attorneys, and *Benjamin Poss* and *Joseph P. Brazy,* both of Milwaukee of counsel, and oral argument by *Mr. Poss* and *Mr. Brazy.*

*B. F. Saltzstein* and *E. J. Gross,* both of Milwaukee, attorneys, and *Lyman W. Sherwood* of Chicago of counsel, for the Hopkins Street Building & Loan Association.

For the Reliance Building & Loan Association briefs were filed by *Wallace Reiss* of Milwaukee, attorney, and *Lyman W. Sherwood* of Chicago of counsel.

For the Northern Building & Loan Association briefs were filed by *John H. Schlintz* of Milwaukee, attorney, and *Lyman W. Sherwood* of Chicago of counsel.

The following opinion was filed December 11, 1934:

FAIRCHILD, J. The Reliance Building & Loan Association and the Northern Building & Loan Association, respondents on this appeal, and the Hopkins Street Building & Loan Association, defendant in the original action here, are each Wisconsin corporations organized under the provisions of ch. 215, Stats. This chapter places the control and supervision of building and loan associations under the Banking Commission, and authorizes the commission to take possession of and liquidate such an association when it shall appear that it is violating its charter or any of the laws of the state.

On July 22, 1932, congress enacted the Federal Home Loan Bank Act (12 USCA, § 1421 *et seq.*). By virtue of the provisions of this act, state building and loan associations were eligible to membership and, under certain conditions and restrictions, entitled to borrow from a Federal Home Loan Bank. The Wisconsin legislature, on July 10, 1933, by its enactment of sec. 215.07 (8), Stats., authorized Wisconsin building and loan associations, with the approval of the Commissioner of Banking, to become members of and borrowers from the Federal Home Loan Bank. Each of the building and loan associations here involved became

members of the Federal Home Loan Bank. On June 13, 1933, there was enacted by the congress of the United States the Home Owners' Loan Act (12 USCA, § 1461 *et seq.*), section 5 of which authorizes the Federal Home Loan Bank Board to provide for the organization of associations to be known as Federal Savings & Loan Associations and to issue charters therefor; and on April 27, 1934, by amendment to the Home Owners' Loan Act (12 USCA, § 1464 (i) ), it was provided:

"Sec. 5 . . . (i) Any member of the Federal Home Loan Bank may convert itself into a Federal Savings & Loan Association under this act upon a vote of 51 per centum, or more of the votes cast at a legal meeting called to consider such action; but such conversion shall be subject to such rules and regulations as the board may prescribe, and thereafter the converted association shall be entitled to all the benefits of this section and shall be subject to examination and regulation to the same extent as other associations incorporated pursuant to this act."

Following the passage of the amendment just referred to and without further consent or authority of the state, application was made by the three associations to the Federal Home Loan Bank Board for permission to convert themselves into federal savings and loan associations under the provisions of sec. 5 (i) of the Home Owners' Loan Act of 1933 as amended. In each case the Federal Home Loan Bank Board granted the permission. With reference to the Hopkins Street Building & Loan Association, the Banking Commission undertook to prevent the proposed conversion, but in compliance with the order of the circuit court for Milwaukee county, desisted from such attempt, and the association accepted a charter from the Federal Home Loan Bank Board and has since held itself out to be a savings and loan association free from the jurisdiction and control of the Banking Commission of this state. An original action

is brought against the association seeking to have the attempted conversion declared null, void, and of no effect. The Reliance Building & Loan Association and the Northern Building & Loan Association each began an action to restrain the Banking Commission from interfering with its proposed conversion. In those cases the Banking Commission interposed counter-claims praying for declaratory relief similar to that sought in the original action in this court and an injunctional order to prevent the proposed conversion. This is briefly a description of the record in the three matters, and they present identical questions. The learned judge who tried the two cases in which judgment was entered below was of the opinion that congress had power to incorporate federal savings and loan associations; that the language of sec. 5 (i) of the Home Owners' Loan Act of 1933, as amended April 27, 1934, did not imply the necessity of consent by the state to the proposed conversion of a state loan association into a federal loan association; and that congress had the power to authorize the conversion without the consent of the state.

The cause was first submitted upon arguments and briefs dealing to a large extent with the questions of whether congress has power to incorporate federal savings and loan associations, and as to the power of congress to supersede the authority of the state over building and loan associations created by the state, and to invest such corporations with corporate power to transmute themselves into federal savings and loan associations. We have since been favored by the contending parties with supplemental briefs in which are able discussions of the reservation by the state of power over corporate charters. Since then we have again examined the questions raised. We are convinced that the precise question before us relates to the power of a building and loan association, organized under and subject to the laws of the state of Wisconsin, to convert itself into a savings and loan association under the federal act. While the other questions

are well within the limits of proper discussion as outlined by the issues, it is worthy of emphasis that all other questions are incidental to this controlling question, and such reference to them as may be made is in aid of the determination of the actual corporate powers of a state organized building and loan association to accomplish transmutation. This being true, we will therefore consider whether the respondents, by reason of provisions in their charters or the laws of their creator, have any such power.

The respondents were created by the state of Wisconsin at a time when without question the state had plenary power to create and to control the powers of these corporations. They are not banks; they have not banking powers or privileges under our state laws. *Leahy v. National Bldg. & Loan Asso.* 100 Wis. 555, 76 N. W. 625; *Julien v. Model B., L. & I. Asso.* 116 Wis. 79, 92 N. W. 561; *First Nat. Bank v. County of Dawson,* 66 Mont. 321, 213 Pac. 1097; *Lomb v. Pioneer Savings & Loan Co.* 106 Ala. 591, 17 So. 670; *Hoenig v. Huntington Nat. Bank of Columbus* (C. C. A.), 59 Fed. (2d) 479, 48 L. Ed. 560; *Mercantile Nat. Bank v. Hubbard* (C. C. A.), 99 Fed. 465; ch. 215, Stats. 1933. Their charters do not authorize them to divest themselves of the corporate charter conferred upon them by the laws of the state. They have only the powers emanating from the state. These powers must be used as prescribed by the state and with due consideration for the contractual rights between the stockholders and the corporation existing by reason of state law and the charter of the corporation. Under the declared law of the state, we are bound to hold that a corporation organized under our general incorporation laws has not the power to divest itself of the corporate character derived from this sovereign state by accepting a charter from any other sovereign government. Our constitution, sec. 1, art. XI, provides:

"All general laws or special acts, enacted under the provisions of this section [section authorizing the creation of

corporations] may be altered or repealed by the legislature at any time after their passage."

The people of our state thereby vested a reserve power over charters of corporations in the legislature. The idea that any other body or sovereign, a stranger to the contract, or that the corporation alone may deprive the state of this power is foreign to the plain meaning of the language used in the constitution with relation to that subject. This provision of our constitution and similar provisions to be found in the constitutions of other states were adopted for the purpose of overcoming in part the effect of the decision of the United States supreme court in *Trustees of Dartmouth College v. Woodward,* 4 Wheat. 518, 4 L. Ed. 629. In that case it was held that a corporation created by a state became a separate corporate entity and subject to control by the state to the extent only that citizens of the state were subject to control under the constitution; that any amendment, alteration, or repeal of its charter which withdrew or impaired the obligations of the charter was in violation of sec. 10, art. I, of the constitution of the United States, which provides: "No state shall . . . pass any . . . law impairing the obligations of contracts."

The nature of the power expressly reserved by the Wisconsin constitutional provision has been dealt with in many cases, both in state courts and in the courts of the United States. A reference to these cases shows the extent of this power and its proper use in controlling charters issued to corporations. In *West Wisconsin R. Co. v. Board of Supervisors of Trempealeau County,* 35 Wis. 257, 270, referring to sec. 1, art. XI, of the constitution, the court said:

"The object and historical origin of the provision in the constitution of this state are matters known to all professional men. They were, through this paramount authority, to retain and secure to the state full power and control over corporate franchises, rights and privileges which it might grant,—a power and control which the state was in a measure

deprived of by the federal constitution, as that instrument had been interpreted in the celebrated *Dartmouth College Case.*"

It was also considered in another celebrated case, *Attorney General v. Railroad Companies,* 35 Wis. 425, 574, where the court said:

"And, by force of the constitutional power reserved and of the uniform construction and application of it, the rule of the *Dartmouth College Case,* as applied to corporations, never had place in this state, never was the law here. The state emancipated itself from the thraldom of that decision, in the act of becoming a state; and corporations since created here have never been above the law of the land.

"Subject to this reserved right, and under the rule in the *Dartmouth College Case,* charters of private corporations are contracts. . . . The material property and rights of corporations should be inviolate, as they are here; but it comports with the dignity and safety of the state that the franchises of corporations should be subject to the power which grants them, that corporations should exist as the subordinates of the state, which is their creator, *durante bene placito.*

"This is a question of state law, not of federal law. We give full scope to the federal constitution as interpreted by the federal courts, but we stand clearly outside of both. This question could be brought within the Dartmouth College rule, not by interpretation of the federal constitution, but by interpretation of the state constitution only. That is our function. We accept the construction of the federal constitution as the federal courts give it. But we give construction to our own constitution for ourselves. And there we might well rest."

The court pointed out that the exercise of the reserve power had been sanctioned by the federal and other state courts and cited cases.

While the federal constitution contains no power reserving to congress the right to amend, alter, or modify the charters of corporations created by it, congress has in numerous instances reserved the power in the act by which corporations were created. In *Union Pacific R. Co. v. United*

*States* (*Sinking-Fund Cases*), 99 U. S. 700, 25 L. Ed. 496, the supreme court of the United States had under consideration the act of congress incorporating the Union Pacific Railroad Company, which act contained the following reservation: "Congress may at any time alter, amend, and repeal this act." Considering this in connection with a former act of congress, the court said:

"We are of the opinion that congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments of the charter as come within the just scope of legislative power. That this power has a limit, no one can doubt. All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made; but, as was said by this court, through Mr. Justice CLIFFORD, in *Miller v. The State,* 15 Wall. 498, 21 L. Ed. 104, 'It may safely be affirmed that the reserve power may be exercised, and to almost any extent, to carry into effect the original purposes of the grant, or to secure the due administration of its affairs, so as to protect the rights of stockholders and of creditors, and for the proper disposition of its assets.' "

See also *Close v. Greenwood Cemetery,* 107 U. S. 466, 476, 2 Sup. Ct. 267, 27 L. Ed. 408; *Tomlinson v. Jessup,* 15 Wall. (82 U. S.) 454, 21 L. Ed. 204.

In *Huber v. Martin,* 127 Wis. 412, 105 N. W. 1031, 1040, 1135, a law was held unconstitutional under which a mutual insurance company attempted to convert itself into a stock company pursuant to an act of the legislature of the state of Wisconsin permitting it to do so at the option of two-thirds of its existing policyholders, representing not less than one-half of its outstanding insurance. It was sought to sustain this action of the legislature under sec. 1, art. XI, Wis. Const., as an exercise of the power thereby reserved. It was argued that since the legislature had power to provide for the dissolution of a corporation, it might also provide

for the disposition of its assets to a successor corporation. The court said:

"The right of the corporation to hold its property in harmony with that situation, and the rights of the members to have the same so held and administered, were property interests resting on contractual obligations and so within the guaranty of the state constitution as regards the passage of laws impairing the obligations of contract, sec. 12, art. I, Const. of Wis., and that of the national constitution as regards the deprivation of property without due process of law, or denying to persons the equal protection of the laws. XIVth Amend. U. S. Const. . . . The act of the legislature in question, in terms or in effect, authorizes the appropriation of the property of one private corporation and the equitable interests therein of the members thereof to the use of another private corporation and of its members in violation of the corporate charter rights of the former corporation, and in defiance of the wishes of such of its members as do not choose to consent thereto."

The matter was further dealt with in *State ex rel. Northern Pac. R. Co. v. Railroad Comm.* 140 Wis. 145, 157, 121 N. W. 919. In that case the court said:

"The reserve power stops short of the power to divest vested property rights, and is embodied in the state constitution for the purpose of enabling the state to retain control over corporations, and must be construed in connection with the other provision of the constitution to the effect that private property shall not be taken for public use without compensation. . . . Moreover, the power to alter or amend is a reserve power in the interest of the state to modify or repeal its own contract with the corporations. *Tomlinson v. Jessup,* 82 U. S. 454; *State v. Railway Cos.* 128 Wis. 449, 108 N. W. 594."

There can be no doubt but that it was intended by the framers of the constitution to reserve in the state the power to alter or repeal the charter of any corporation created by the legislature. The constitution having thus limited the power of the legislature, it would seem to follow that the legislature is without authority to divest itself of the power

reserved to it by the constitution. But if it should be held that the legislature has such power, it is still constitutionally disabled from authorizing any part of the stockholders of a corporation created by it, to impose a new charter upon non-consenting members of the corporation. A fundamental and radical change in the purpose of a corporation cannot be accomplished by an act of the corporation over the dissent of a single stockholder. *Martin Orchard Co. v. Fruit Growers C. Co.* 203 Wis. 97, 233 N. W. 603; *Huber v. Martin, supra;* 7 R. C. L. p. 97. And there is a fundamental and material difference between being a member of a building and loan association over which the representatives chosen by the people of this state have the reserve power of control and being a member of one created by the legislative body of a different sovereign power.

Our legislature has enacted laws covering the entire subject-matter of control of these associations and has molded them to the needs of the communities, regulating the manner by which they may come into existence and continue in business. Ch. 215, Stats. 1933, expressly regulates the powers conferred upon them. If it be urged that sec. 215.07 (8), Stats., reading:

"With the approval of the commissioner, any association may borrow money from the federal home loan bank upon such terms and for such time as the laws and rules of such federal home loan bank may prescribe, the provision in subsection (2) of section 215.07 as to the one-year time limit and as to the amount that may be borrowed, to the contrary notwithstanding,"

authorizes a building and loan association organized under the provisions of ch. 215 to divest itself of its charter as a state corporation, the answer is that sec. 215.07 (8) confers no such power nor was it intended to confer such power. Sec. 215.07 (2), Stats. 1933, provides:

"To borrow money for temporary purposes, not inconsistent with the objects of the association, and issue its evi-

dences of indebtedness therefor, but for no longer term than one year and not exceeding in the aggregate amount one-fifth of the assets on hand."

Sec. 215.07 (8) is a provision authorizing building and loan associations, as to loans made from the Federal Home Loan Bank, to waive the limitation upon the power to borrow found in sec. 215.07 (2). It does not attempt to deal with the power of a building and loan association to sever the ties which bind it to the state from which it derives its charter. To hold that such power was conferred by sec. 215.07 (8) would be clear judicial legislation in a matter vitally important to the state involving large questions of public policy. Since respondents' charters do not provide for transmutation and no authority emanating from the state of Wisconsin accords them the privilege, or attempts to confer corporate power upon them to transmute, two questions are suggested: First, has congress by enactment of the Federal Home Owners' Loan Act attempted to supersede the authority of the state and actually to invest respondents with corporate power essential to a transmutation? Second, if it be found that it was the purpose of congress by that act thus to increase respondents' corporate powers, then, has congress the power to accomplish this result?. We are not treating specifically the second question for reasons already set forth.

As to the first question, we are of the opinion that the Federal Home Owners' Loan Act does not affect the state's right to charter corporations and retain control over them under the state constitution from the date of their beginning until in some lawfully prescribed way they pass out of existence as state corporations. Nor does that act attempt to invest the state corporations with any power not granted to them by the state which created them. The act was intended to be administered in forty-eight states, and applies to corporations operating under different degrees of state control and with different powers. It does not purport to invest the vari-

ous state corporations with any new or different corporate powers. It does no more than to afford consent applicable to corporations having the power to transmute. If a state, either in the original charter of its corporation or by subsequent legislation, permitted such a transmutation as is proposed here upon consent of seventy-five per centum of the stockholders, such a corporation could not change into a federal corporation upon a vote of fifty-one per centum of the stockholders. Nor would a state statute providing a minimum below fifty-one per centum render the association acceptable. The fifty-one per centum provision set up in the federal act may readily be interpreted as the manner of consenting by the membership which the federal government requires to a transmutation. The opportunity is thus afforded to those who are so situated that they can accept the offer if it be deemed by them to be to their advantage. It does not appear to be a supplanting of the requirements in the charter of a corporation. Were it otherwise, the exercise of such a power would do two things : First, it would enable a building and loan association to escape from regulatory control reserved by the state, and, second, it would divest stockholders of their rights in the corporation under state law and substitute therefor rights alleged to be equivalent in a corporation organized under the laws of the United States. As pointed out elsewhere in this opinion, this would raise serious constitutional questions, for a corporate charter is not only contractual between the state and its creature corporation, but it is also contractual with respect to the rights of a stockholder in a corporation. *Huber v. Martin, supra.*

Any method under which a state association seeks to transfer itself into a federal group without consideration of the contractual relation existing between it and the state would seem to be ineffective. It has only the powers emanating from the state, and these must be used as prescribed by the state with due consideration for the contractual rights be-

tween stockholders and the association existing by reason of state laws and the charter of the corporation.

We will not review all the cases cited by respondents in support of the claim of right to transmutation, but our attention is called to *Casey v. Galli,* 94 U. S. 673, 24 L. Ed. 168, and particular emphasis is placed on the statement in the opinion : "It was as competent for congress to authorize the transmutation as to create such institutions originally." A receiver of a national bank, which by an act of congress had been converted from a state bank without an enabling act by the state, brought suit against a stockholder upon his stockholder's liability. A plea in abatement based upon the failure to obtain the consent of the state was held bad. That the quoted words were intended to be a complete statement of a rule of law to the exclusion of all qualifications may well be doubted, but even if such was the intention, we cannot recognize the result in that case as determining that the federal government may invade the jurisdiction of the state government and appropriate for its own purposes the agencies devised by the state for the welfare of its citizens or interfere against the wish of the state with respect to contracts existing between the state and corporations of its own creation. Whatever power congress may have over transmutation of banking corporations, it may at least be reasonably questioned whether it has such power with respect to other domestic corporations organized under state law for the state's purposes in providing for the welfare of its citizens. It ought also to be said that aside from the fact that the Federal Home Owners' Loan Act does not deal with the general subject of banking, as did the law involved in the *Galli Case,* it is otherwise quite different from the statute there involved and construed. That act authorized state banks to become national banks. 13 U. S. Stats. at L. 112, 113, § 44, provided "that any bank incorporated by special law, or any banking institution organized under a general law of any state, may,

*by authority of this act,* become a national association under
its provisions. . . ." It is specifically provided that "the
articles of association and the organization certificate re-
quired by this act may be executed by a majority of the
directors of the bank or banking institution; and said certifi-
cate shall declare that the owners of two-thirds of the capital
stock have authorized the directors to make such certificate
and to change and convert the said bank or banking institu-
tion into a national association under this act." A majority
of the directors are thereafter specifically given the power to
execute all necessary papers essential to a perfection of the
organization as a national association. This act constituted
an unmistakable investiture of corporate powers upon state
banks. If our conclusion that the Federal Home Owners'
Loan Act operates merely as an authority or consent, or
definition of the conditions under which transmutation will
be permitted, so far as the federal government is concerned,
without purporting to increase corporate powers of state cor-
porations, is not clearly sustained by the act, it must at least
be said to be ambiguous and to be open to this construction.
We think it should be so construed in order to avoid a num-
ber of serious constitutional objections which may here be
recited without determining their validity, but merely as an
aid to construction. The first is the objection that since
Wisconsin, by power reserved in its constitution, has retained
control over corporations organized under its laws, and since
the state undoubtedly had plenary powers, both of organiza-
tion and control, prior to this act, it cannot be ousted by any
act of congress from these powers; that since a building and
loan association is not a banking institution, the case of
*Casey v. Galli, supra,* has no application; that the change in
the corporate charter permitting conversion upon a vote of
fifty-one per centum of the stockholders would be an impair-
ment of the contract rights of stockholders in a Wisconsin

corporation. That these are serious constitutional objections must be conceded, whatever their proper solution may be. Further than this, an attempt on the part of congress to interfere with the control of corporations organized under state laws, and to invest them with new powers, must certainly be regarded as a very sweeping and fundamental innovation. In view of these considerations, the act itself should contain the clearest sort of language to warrant the contention asserted by respondents. This we do not find.

Respondents call our attention to *Ex parte Worcester County National Bank,* 279 U. S. 347, 49 Sup. Ct. 368. From the opinion of the United States supreme court in that case, it appears that the supreme judicial court of Massachusetts held that under the constitution and laws of that state, a state bank could change its organization to that of a federal bank without any authority given by the state to make the change. That decision rests definitely upon a determination by the supreme judicial court of Massachusetts of a question of state law. We shall not attempt an analysis of the decision of the Massachusetts court. The question before us is one of state law, and in answering that question we must proceed in accordance with the existing law of the state of Wisconsin.

It is our conclusion that respondents have no power to transmute, and that any purported efforts in that direction are void for want of this power. It is assumed that if the act of congress is to be given the construction contended for by respondents, it results not in the creation of a new corporation, but in the transfer of its allegiance by the state corporation, from the sovereignty of its creation, to the federal government. It has not been thought necessary to consider the possibility that congress, by this act, has created a new corporation, because in that event, there being no provision in the charter of the original corporation or in the laws of

Wisconsin for a transfer of its property, the corporation would find itself a naked legal entity without any means of carrying out the purposes of the transfer.

*By the Court.*—Judgments entered in the circuit court are reversed, and causes remanded with directions to enter judgment in favor of the Banking Commission on its counterclaim. In the original action in this court, let the writ issue.

A motion for a rehearing was denied, with $25 costs in one case only, on February 5, 1935.