**FIRST FEDERAL SAVINGS & LOAN ASS'N OF WISCONSIN v. LOOMIS, Atty. Gen. of Wisconsin, et al.**

No. 6381.

Circuit Court of Appeals, Seventh Circuit.

May 20, 1938.

832

SPARKS, Circuit Judge, dissenting.

Orland S. Loomis, Atty. Gen. of Wisconsin, Leo E. Vaudreuil, Deputy Atty. Gen., of Wisconsin, and Benjamin Poss, Sp. Counsel, and Joseph P. Brazy, both of Milwaukee, Wis., for appellants.

William Ryan, of Madison, Wis., and Horace Russell, of Washington, D. C., Gen.

Counsel, Federal Home Loan Bank Board, (Emery J. Woodall, of New York City, Associate Gen. Counsel, Federal Home Loan Bank Board, J. Aldrich Hall, and Milton I. Baldinger, both of Washington, D. C., of counsel), for appellee.

Golden W. Bell, Asst. Sol. Gen., and Warner W. Gardner, Sp. Atty., of Washington, D. C., for the United States as amicus curiæ.

Gerard M. Ungaro and Lyman W. Sherwood, both of Chicago, Ill., amici curiæ.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

MAJOR, Circuit Judge.

This appeal is from an injunctive decree of the District Court.[1] The questions presented are: (1) Whether the District Court had jurisdiction of the action under sections 24 and 274d of the Judicial Code, 28 U.S.C.A. §§ 41 and 400; (2) whether section 5 of the Home Owners' Loan Act of 1933, as amended, 12 U.S.C.A. § 1464, is a valid exercise of the constitutional power of Congress; (3) whether appellants have a right to assert the invalidity of that act.

Appellee is a federal savings and loan association organized on February 20, 1934, under the act in question. The United States owns fully paid income shares of appellee of the aggregate par value of $275,-000. The Home Owners' Loan Corporation, whose capital stock is wholly owned by the United States, is the owner of fully paid income shares of appellee of the aggregate par value of $150,000, and the aggregate of both ownerships constitutes 51 per cent. of appellee's total capital stock. Appellee has its principal place of business in Milwaukee, Wisconsin, and, since its incorporation, has transacted business in that State, without its permission and over its objection.

Under the provisions of section 14.53 of the Wisconsin Statutes the Attorney General of that State is authorized to appear for it in the prosecution or defense of all

---

[1] "It is ordered, adjudged, and decreed that the defendants above named,' and all persons claiming to act under their authority, direction, and control, do desist and refrain from interfering with the plaintiff, its officers, directors, and employees, its franchises, property, and business, in any manner or form, and from suing or attempting to sue plaintiff, its officers, directors, and employees, and from

prosecuting any action at law or in equity directly or indirectly against the plaintiff, its officers, directors, and employees, for the purpose of preventing the plaintiff from, or hindering plaintiff in exercising its franchise to do business as a federal savings and loan association, or transacting its business within the state of Wisconsin."

actions in which the State is interested or is a party. By the provisions of section 294.04 of the same Statutes, he is authorized to bring an action in the name of the State upon his own information, or upon the complaint of any private party, when any person shall usurp, intrude into, or unlawfully hold or exercise any franchise, within the State of Wisconsin. Pursuant to the Statutes of that State the Banking Commission of Wisconsin has authority to issue certificates of incorporation to building and loan associations, without which no such association may function within that State. It also has general supervision and control over the business of such associations incorporated under the laws of that State, including authority to require such associations to follow and observe the provisions of its laws with respect to such associations.

Prior to the beginning of this action the State of Wisconsin, upon the relation of appellants, applied to the Supreme Court of Wisconsin for leave to begin an original action in that court and filed an information against appellee and its officers and directors, of which due notice was given them. State ex rel. Cleary v. Hopkins St. Bldg. & Loan Ass'n, 217 Wis. 179, 257 N.W. 684. That proceeding was in the nature of quo warranto, and sought to determine whether appellee could lawfully engage in a building and loan business in Wisconsin without complying with the laws of that State. It also sought to oust appellee from usurping, intruding into, holding or exercising the franchise or privilege of engaging in or operating as a building and loan association within Wisconsin. That relation and petition, among other matters, set forth the state statutory provisions with respect to the organization and conduct of such associations and alleged that they had been in force for more than sixty years; that such associations were under the administrative agency of the State, through its banking department, which for over twenty years had discretionary powers in granting or refusing certificates of incorporation according to certain standards; that such associations are quasi-public corporations under the control and supervision of appellant, the Commission; that investments of such associations and the quality of mortgages accepted by it are subject to the approval of the Commission, to which such associations must make reports of their financial conditions, and whenever the business of such an association is conducted contrary to law, or when its financial condition is unsound, the Commission may take charge of and liquidate it. It was further alleged that no necessity existed for additional building and loan associations in Milwaukee; that, pursuant to authority from the Commission, seventy-nine such associations existed and were doing business in Milwaukee, a city of 600,000 population; that the last one authorized in that city, on April 28, 1930, had liquidated and discontinued business, and that the State through its Commission, at various times since that date, had determined that additional associations in that city would interfere with, jeopardize, and damage such associations already established, and the building and loan association plan as provided by the State laws.

At this juncture appellee filed its bill in equity in the District Court of the United States, by which it sought the relief granted in the decree, and asked for a declaratory judgment that appellee had the lawful right and franchise to transact business as a Federal Savings and Loan Association within the State of Wisconsin, and that as such it was under the sole authority and control of the laws of the United States.

Among other matters the bill averred that appellants would, unless restrained, bring suits in the courts of the State to prevent appellee from transacting any business; that they were asserting that appellee was unlawfully usurping and exercising a franchise, and transacting business without authority or right to do so; that the acts done and threatened to be done by appellants were wrongful and without authority of law, and would hinder and harass appellee in the transaction of its business, and in the performance of its duties as an instrumentality of the United States, and that the injury caused thereby to appellee would be irreparable, and the amount thereof was not wholly measurable in damages or fully recoverable in an action at law.

Appellants answered the bill in equity and later filed their amended answer setting forth allegations similar to those contained in their petition and information lodged with the Supreme Court, as hereinbefore referred to. The amended answer admitted certain allegations of the bill, and denied others, including appellee's legal existence and its right to do business in Wisconsin. There were further denials that they had made or were making statements deroga-

tory to appellee's business which had damaged it, or would damage it in the future. They accordingly prayed that appellee be declared to be unlawfully engaged in the building and loan business in Wisconsin, and that it be restrained from continuing such business; that the preliminary injunctions be dissolved and the bill dismissed.

Appellee thereupon filed its motion to dismiss the amended answer, and for a decree pro confesso according to the demand of the bill. The court did not pass upon this motion, but without hearing evidence, filed special findings of fact, upon which it concluded:

"1. That the Home Owners' Loan Act of 1933, including section 5 thereof, is valid.

"2. That the plaintiff is a corporation organized and existing pursuant to and by virtue of said Act, and has the lawful right to transact business as a Federal savings and loan association within the State of Wisconsin, and that as a Federal savings and loan association it is under the sole authority and control of the laws of the United States."

Upon these findings and conclusions, and on appellee's motion, it rendered the injunctive decree hereinbefore set forth.

■ Appellants' first contention is premised on their allegation that appellee had full right and opportunity to assert all of its right and obtain all the relief claimed in this action, by defending in the proceeding brought by appellants, in the name of the State of Wisconsin upon relation of its officials, in the Supreme Court of Wisconsin. We think there is no merit in this contention, under the rulings in Ludwig v. Western Union Telegraph Company, 216 U. S. 146, 30 S.Ct. 280, 54 L.Ed. 423; Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468.

■ At the threshold of the second and main question presented we are met with appellee's contention that appellants have no right to assert the invalidity of the act upon which appellee's rights are said to be based. Appellee bases its argument in support of this contention on the proposition that inasmuch as Wisconsin is not a party to this action, the mere accident that appellants are public officers of the State gives them no right to assert the invalidity of the statute until it appears that its enforcement might render them personally liable.

If we admit the premise, we may concede the proposition, but it is fully met by section 14.53(1), Wisconsin Statutes, 1937:

"The Attorney-general shall:

"Appear for the state and prosecute or defend all actions and proceedings, civil or criminal, in the supreme court, in which the state is interested or a party, and attend to and prosecute or defend all civil cases sent or remanded by the supreme court to any circuit court in which the state is a party; and, when requested by the governor or either branch of the legislature, appear for the state and prosecute or defend in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people thereof may be in any wise interested."

Here is a clear mandate from the Legislature which describes an imperative duty of the Attorney General and supports the institution of the original action in the Supreme Court of Wisconsin. The negligent or willful violation of such duty would render him personally liable. Analogous and related duties are likewise laid upon the Commission by state statute which made it quite proper for it to participate in the quest for relief sought in that case. A violation of its duties would likewise render its individual members personally liable. The instant action sought to restrain the acts which appellants conceived to be their duty to perform by instituting the quo warranto proceeding. Whether appellants' conception of their duty is sound depends solely upon the validity of the federal statute here involved, and we think they have a personal interest as well as a duty in having that question determined. Moreover, the suit in the Supreme Court was in effect a suit by the State of Wisconsin, and likewise the instant action in effect is one against that State. See Hopkins Federal Savings & Loan Association v. Cleary, 296 U.S. 315, 56 S.Ct. 235, 80 L.Ed. 251, 100 A.L.R. 1403. We hold that the question is properly raised by appellants' answer.

■ Appellee contends, however, that under the section quoted, the Attorney General had no authority to defend this action unless specifically authorized by the Governor, or one branch of the Wisconsin Legislature. Both the Legislature and Governor had already spoken with respect to the Attorney General's duties, in this, as well as many other enactments too numerous to mention. It would be an illogical

construction to hold that the Attorney General could not perform such duties, so specifically described and enjoined, without the consent of either the Governor or one branch of the Legislature. In the absence of a construction of the quoted statute by the courts of Wisconsin, we construe it to mean that when the Attorney General, in the exercise of his judgment, or for any reason, fails to institute or defend such action, he shall be required to do so if either the Governor or one branch of the Legisla-

ture requests it. In other words, it is not left solely to the determination of the Attorney General whether a suit shall be prosecuted or defended.

The pertinent parts of section 5 of the Home Owners' Loan Act of 1933, as amended in 1934 and 1935, 12 U.S.C.A. § 1464, are substantially set forth in the margin.[2]

In Hopkins Federal Savings & Loan Association v. Cleary, 296 U.S. 315, 56 S.Ct. 235, 80 L.Ed. 251, 100 A.L.R. 1403, the State

[2] Sec. 5. *Federal Savings and Loan Associations.*

"(a) *Organization authorized.* In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as "Federal Savings and Loan Associations," and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States.

"(b) *Capital; deposits; certificates of indebtedness.* Such associations shall raise their capital only in the form of payments on such shares as are authorized in their charter, which shares may be retired as is therein provided. No deposits shall be accepted and no certificates of indebtedness shall be issued except for such borrowed money as may be authorized by regulations of the Board.

"(c) *Loans; security required; investment of assets.* Such associations shall lend their funds only on the security of their shares or on the security of first liens upon homes or combination of homes and business property within fifty miles of their home office: *Provided,* That not more than $20,000 shall be loaned on the security of a first lien upon any one such property; except that not exceeding 15 per centum of the assets of such association may be loaned on other improved real estate without regard to said $20,-000 limitation, and without regard to said fifty-mile limit, but secured by first lien thereon: *And provided further,* That any portion of the assets of such associations may be invested in obligations of the United States or the stock or bonds of a Federal Home Loan Bank: *(And provided further,* That any such association which is converted from a State-chartered institution may continue to make loans in the territory in which it made loans while operating under State Charter.)

[Parenthesis added by Amendment of May 28, 1935.]

"(d) *Rules and regulations.* The Board shall have full power to provide in the rules and regulations herein authorized for the reorganization, consolidation, merger, or liquidation of such associations, including the power to appoint a conservator or a receiver to take charge of the affairs of any such association, and to require an equitable readjustment of the capital structure of the same; and to release any such association from such control and permit its further operation.

"(e) *Qualifications of incorporators; selection of localities for establishment.* No charter shall be granted except to persons of good character and responsibility, nor unless in the judgment of the Board a necessity exists for such an institution in the community to be served, nor unless there is a reasonable probability of its usefulness and success, nor unless the same can be established without undue injury to properly conducted existing local thrift and home-financing institutions.

"(f) *Associations as members of Federal Home Loan Bank.* Each such association, upon its incorporation, shall become automatically a member of the Federal Home Loan Bank of the district in which it is located, or if convenience shall require and the Board approve, shall become a member of a Federal Home Loan Bank of an adjoining district. Such associations shall qualify for such membership in the manner provided in chapter 11 of this title with respect to other members.

"(g) *Subscription to preferred stock by United States; retirement.* The Secretary of the Treasury is authorized on behalf of the United States to subscribe for preferred shares in such associations which shall be preferred as to the assets of the association and which shall be entitled to a dividend, if earned, after payment of expenses and provision for reasonable reserves, to the same extent as other shareholders. It shall be the duty of the Secretary of the Treasury to subscribe for such preferred shares upon the

836

of Wisconsin, through its Banking Commission, challenged the validity of the amended act. The Supreme Court held that the act, that is to say subsection (i), to the extent that it permitted the conversion of state associations into federal ones in contravention of the laws of the place of their creation, was an unconstitutional encroachment upon the reserved powers of the States, under the tenth amendment. The court further said (page 240):

"For the purposes of these cases, we find it needless to consider whether Congress has the power to create building and loan associations and thereupon to invest them with corporate capacity. * * *"

"Confining ourselves now to the precise and narrow question presented * * *, we hold that the conversion of petitioners from state into federal associations is of no effect when voted against the protest of Wisconsin. Beyond that we do not go. No question is here as to the scope of the war power or of the power of eminent domain or of the power to regulate transactions affecting interstate or foreign commerce."

█ It is conceded that the Constitution does not expressly empower Congress to incorporate or establish building and loan associations. Appellee, however, contends that such power exists as a fiscal power derived by implication from the aggregate of express powers granted to Congress and by virtue of article 1, section 8, clause 1 of the Constitution, U.S.C.A.Const. art. 1, § 8, cl. 1.·

That Congress has the power to create financial corporations as fiscal agents of the government is not disputed—in fact, such power has so often been recognized by the courts that it is now a settled matter. McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579; Farmers' & Mechanics' National Bank v. Dearing, 91 U.S. 29, 23 L.Ed. 196; Davis y. Elmira Savings Bank, 161 U.S. 275, 16 S.Ct. 502, 40 L.Ed. 700; and Smith v. Kansas City Title & Trust Company, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577. As was said in the last cited case, page 210, 41 S.Ct. page 248:

"But the existence of the power under the Constitution is not determined by the extent of the exercise of the authority con-

request of the Board; but the subscription by him to the shares of any one association shall not exceed $100,000, and no such subscription shall be called for unless in the judgment of the Board the funds are necessary for the encouragement of local home financing in the community to be served and for the reasonable financing of homes in such community. Payment on such shares may be called from time to time by the association, subject to the approval of the Board and the Secretary of the Treasury; but the amount paid in by the Secretary of the Treasury shall at no time exceed the amount paid in by all other shareholders, and the aggregate amount of shares held by the Secretary of the Treasury shall not exceed at any time the aggregate amount of shares held by all other shareholders. To enable the Secretary of the Treasury to make such subscriptions when called there is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000,000, to be immediately available and to remain available until expended. Each such association shall issue receipts for such payments by the Secretary of the Treasury in such form as may be approved by the Board, and such receipts shall be evidence of the interest of the United States in such preferred shares to the extent of the amount so paid. Each such associa-

tion shall make provision for the retirement of its preferred shares held by the Secretary of the Treasury, and beginning at the expiration of five years from the time of the investment in such shares, the association shall set aside one third of the receipts from its investing and borrowing shareholders to be used for the purpose of such retirement. In case of the liquidation of any such association the shares held by the Secretary of the Treasury shall be retired at par before any payments are made to other shareholders.

"(h) *Exemptions from taxation.* [This section exempts such associations from federal taxation, and from state or local taxation greater than that imposed by such authority on other similar institutions.]

"(i) *Conversion of member of Federal Home Loan Bank into Federal Savings and Loan Association.* Any member of a Federal Home Loan Bank may convert itself into a Federal savings and loan association under this chapter upon a vote of (51 per centum or more of the votes cast at a legal meeting called to consider such action); but such conversion shall be subject to such rules and regulations as the Board may prescribe, and thereafter the converted association shall be entitled to all the benefits of this section and shall be subject to examination and regulation to the same extent as other as-

ferred under it. Congress declared it necessary to create these fiscal agencies, and to make them authorized depositaries of public money. Its power to do so is no longer open to question."

It will be seen from subsection (k) of section 5, 12 U.S.C.A. § 1464(k), it is expressly provided that Federal Savings and Loan Associations, when designated by the Secretary of the Treasury, shall serve as fiscal agents of the United States and may act as agent for any other instrumentality of the United States when properly designated for such purpose. By virtue of such authority, said associations, including appellee, with certain minor exceptions, have been designated by the Secretary of the Treasury as fiscal agents of the United States for the purpose of selling to their members United States Savings Bonds. Likewise, they have been designated as fiscal agents for the purpose of collecting delinquent accounts arising out of insurance and loan transactions of the administrator under Title 1, section 1 et seq., of the National Housing Act, 12 U.S.C.A. § 1701 et seq., and making investigations and rendering reports respecting the said delinquencies as described by the administrator. Also, they have been designated as fiscal agents of the Home Owners' Loan Corporation to serve as required in connection with the servicing of its loans and properties. The associations are authorized (Section 5 (c), 12 U.S.C.A. § 1464 (c), to invest any portion of their assets in obligations of the United States or the stock or bonds of a Federal Home Loan Bank. Section 5 (h), 12 U.S.C.A. § 1464(h), in recognition of such fiscal functions, exempts from federal taxation, their loans, income, franchises, capital, reserves and surplus, as well as their shares and the income thereon, with certain minor exceptions and permits state taxation only to the extent that similar state institutions are taxed. Section 5(f), 12 U.S.C.A. § 1464(f), automatically makes such associations members of the Federal Home Loan Bank of the district in which

---

sociations incorporated pursuant to this chapter. [Parenthesis substituted for words "its stockholders as provided by the law under which it operates," by Act of April 27, 1934.]

"(j) *Subscription to full paid income shares by United States.* In addition to the authority to subscribe for preferred shares in Federal savings and loan associations, the Secretary of the Treasury is authorized on behalf of the United States to subscribe for any amount of full paid income shares in such associations, and it shall be the duty of the Secretary of the Treasury to subscribe for such full paid income shares upon the request of the Federal Home Loan Bank Board. Payment on such shares may be called from time to time by the association, subject to the approval of said Board and the Secretary of the Treasury, and such payments shall be made from the funds appropriated pursuant to subsection (g) of this section; but the amount paid in by the Secretary of the Treasury for shares under this subsection and such subsection (g), together shall at no time exceed 75 per centum of the total investment in the shares of such association by the Secretary of the Treasury and other shareholders. Each such association shall issue receipts for such payments by the Secretary of the Treasury in such form as may be approved by said Board and such receipts shall be evidence of the interest of the United States in such full paid income shares to the extent of the amount so paid. No request for the repurchase of the full paid income shares purchased by the Secretary of the Treasury shall be made for a period of five years from the date of such purchase, and thereafter requests by the Secretary of the Treasury for the repurchase of such shares by such associations shall be made at the discretion of the Board; but no such association shall be requested to repurchase any such shares in any one year in an amount in excess of 10 per centum of the total amount invested in such shares by the Secretary of the Treasury. Such repurchases shall be made in accordance with the rules and regulations prescribed by the Board for such associations.

"(k) *Federal savings and loan associations, or Federal Home Loan Banks as fiscal agents of United States.* When designated for that purpose by the Secretary of the Treasury, any Federal savings and loan association or member of any Federal Home Loan Bank may be employed as fiscal agent of the Government under such regulations as may be prescribed by said Secretary and shall perform all such reasonable duties as fiscal agent of the Government as may be required of it. Any Federal savings and loan association or member of any Federal Home Loan Bank may act as agent for any other instrumentality of the United States when designated for that purpose by such instrumentality of the United States.

"[Sections (j) and (k) added by amendment of April 27, 1934.]"

they are located and sections 5(g) and 5(j), 12 U.S.C.A. § 1464(g, j), directs the Secretary of the Treasury on the request of the Federal Home Loan, Bank Board to subscribe to preferred shares and full paid income shares, the former not to exceed $100,-000 for any one association and the total for any association not to exceed 75 per cent. of the total investment in its shares.

■ ■ Appellants insist that the provisions with respect to such fiscal power are a mere pretext to accomplish that which otherwise is prohibited. This same argument was advanced and answered by the court in Smith v. Kansas City Title & Trust Co., supra, page 210, 41 S.Ct. page 249:

"But, it is urged, the attempt to create these federal agencies, and to make these banks fiscal agents and public depositaries of the Government, is but a pretext. But nothing is better settled by the decisions of · this court than that, when Congress acts within the limits of its constitutional authority, it is not the province of the judicial branch of the government to question its motives. Veazie Bank v. Fenno, 8 Wall. 533, 541, 19 L.Ed. 482; McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561; Flint v. Stone Tracy Co., 220 U.S. 107, 147, 153, 156, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312 and cases cited."

Stress is laid upon the permissive feature of the language used in creating these fiscal agents and upon the fact that no necessity for additional fiscal agents is disclosed either by the enactment or by counsel, and that such has a material bearing in discovering the intention of Congress. It is our opinion that this is immaterial.

We are not concerned so much with the intention of Congress as with the language actually employed in creating such agencies, and the necessity for the same is a matter with which the courts are not concerned. As was said in Farmers' & Mechanics' National Bank v. Dearing, supra, pages 33, 34: "Of the degree of the necessity which existed for creating them Congress is the sole judge." The intention or motive of Congress in creating such associations and designating them as fiscal agents, is a matter entirely within the legislative province.

In Magnano Co. v. Hamilton, 292 U.S. 40, 44, 54 S.Ct. 599, 601, 78 L.Ed. 1109, it is said:

"Collateral purposes or motives of a Legislature in levying a tax of a kind with-in the reach of its lawful power are matters beyond the scope of judicial inquiry."

In McCray v. United States, 195 U.S. 27, 54, 24 S.Ct. 769, 776, 49 L.Ed. 78, 1 Ann. Cas. 561, the court, in discussing the abuse of power by Congress, said:

"This, when reduced to its last analysis, comes to this; that, because a particular department of the government may exert its lawful powers with the object or motive of reaching an end not justified, therefore it becomes the duty of the judiciary to restrain the exercise of a lawful power wherever it seems to the judicial mind that such lawful power has been abused. But this reduces itself to the contention that, under our constitutional system, the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its powers by another department."

■ Under our tri-system of government, it appears not only logical, but sustained by authority that none of the three branches has any right to question the motive which prompted action on the part of another, but always the question is reduced to that of power or authority to do that which is assailed.

If there is any question of the right of Congress to provide for the creation of such Federal Savings and Loan Associations and their designation as fiscal agents of the government, it seems to us that doubt is dispelled by the Supreme Court in the case of Smith v. Kansas City Title & Trust Company, supra, notwithstanding the rather discriminating analysis of that case by appellant in an effort to distinguish it from the one at bar.

Without going into detail in comparing the legislation there considered with that with which we are now confronted, it is sufficient, we think, to state that the two acts as they relate to the creation of fiscal agencies and the purpose to be accomplished, are so alike in nature that this court must conclude, as the Supreme Court there concluded, that the act is constitutional. It is pointed out that the legislation sustained in the Smith Case made it mandatory that the Federal Land Banks invest not less than 5 per cent. of their capital in bonds of the United States, while in the act under consideration the loan associations are merely authorized to invest any portion of their assets in such bonds. How this difference affects the involved principle, we are unable to discern. Much stress is also laid upon the fact that

the land banks could be designated as public depositaries, while there is no such authority with reference to these loan associations. The mere fact, however, that Congress has not seen fit to confer precisely the same fiscal duties upon each of these agencies, to our mind, is unimportant. The fiscal duties of the federal government are many and varied and the court in the Smith Case, having upheld the authority of Congress to designate land banks as fiscal agents for the purpose of performing certain governmental functions, it necessarily follows, in our opinion, that the power is in Congress to provide for and designate savings and loan associations as such agents, with duties not greatly dissimilar.

█ It is our judgment that the act in question is also sustainable under the "general welfare" clause by reason of the authority of the Supreme Court in Steward Machine Company v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293, and Helvering v. Davis, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319. Each of these cases sustained the validity of certain provisions of the Social Security Act, 42 U.S.C.A. § 301 et seq. In the former was involved the authority of Congress to tax employers for the purpose of providing a fund to care for those unemployed under the circumstances enumerated in the act—in the latter the authority of Congress to tax both employer and employee for the purpose of providing for the payment of old age benefits under the conditions therein enumerated. In each of these cases the court saw fit to relate, in considerable detail, the calamitous and deplorable conditions which existed throughout the country resulting from unemployment and the inability of the aged of the nation to care for themselves. No doubt, from information contained in the record, and as a matter of common knowledge, a picture quite as gloomy could well be painted depicting the situation occasioned by the widespread disaster about to overwhelm the nation because of the dire financial straits of its home owners and their inability to borrow and refinance existing mortgages and liens, without which assistance thousands of them were in imminent danger of losing their homes. To thus describe the situation, however, would perhaps serve no useful purpose. Nor would it be helpful to enter into a lengthy dissertation of the opinions of the court in those cases. It appears to us that much of what was said in those cases, in sustaining the authority of Congress to

spend for the "general welfare" is equally applicable here.

In Helvering v. Davis, supra, after reaffirming that Congress may spend money in aid of the "general welfare," the court on page 640, 57 S.Ct. on page 908, makes this very pertinent observation:

"Yet difficulties are left when the power is conceded. The line must still be drawn between one welfare and another, between particular and general. Where this shall be placed cannot be known through a formula in advance of the event. There is a middle ground or certainly a penumbra in which discretion is at large. The discretion, however, is not confided to the courts. The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment. This is now familiar law. 'When such a contention comes here we naturally require a showing that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress.' United States v. Butler, supra, 297 U.S. 1, at page 67, 56 S. Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. Cf. Cincinnati Soap Co. v. United States, 301 U.S. 308, 57 S.Ct. 764, 81 L.Ed. [1122]; United States v. Realty Co., 163 U.S. 427, 440, 16 S.Ct. 1120, 41 L.Ed. 215; Head Money Cases, 112 U.S. 580, 595, 5 S.Ct. 247, 28 L.Ed. 798. Nor is the concept of the general welfare static. Needs that were narrow or parochial a century ago may be interwoven in our day with the well-being of the nation. What is critical or urgent changes with the times."

█ As we construe this language, it means that Congress may not spend for a "particular welfare" but may spend for the "general welfare." It also seems that the line of demarcation between a particular and general welfare is to be determined largely by a solution of the question as to whether the problem presented is national in scope or merely local. Page 644, 57 S.Ct. page 910. The court found that the problem of caring for the aged was national in scope and consequences, and that Congress had the authority to appropriate and spend for such purpose. Congress, not the courts, is charged with responsibility of making such determination. Thus said the court, page 644, 57 S.Ct. page 910:

"Whether wisdom or unwisdom resides in the scheme of benefits set forth in Title II [42 U.S.C.A. § 401 et seq.], it is not for us to say. The answer to such inquiries

must come from Congress, not the courts. Our concern here as often is with power, not with wisdom. * * * When money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states. So the concept be not arbitrary, the locality must yield. [U.S.C.A.] Constitution, Art. 6, par. 2."

To our mind the preservation of home owners and the promotion of a sound system of home mortgage is none the less national in scope than the provisions for the unemployed and the aged. Its scope, as affecting the welfare of the nation as a whole, is of equal importance. To say that Congress has the authority to make provision for one class but not the other is to make a distinction justified by neither logic nor common sense. The problem presented in one case is no less national in its aspect than that presented in the other.

United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, relied upon by appellant, is not in point. There the opinion of the court rested largely upon what was described as the compulsory and coercive purpose to be accomplished and by the application of economic pressure to obtain compliance with the law. Here there is no coercion or economic pressure upon the State or its citizens. There is no attempt at a regulatory scheme and no attempt to force or persuade any person to accept the benefits provided. The State is as free as before to regulate its own institutions as it may see fit.

The decree of the District Court is affirmed.

SPARKS, Circuit Judge (dissenting).

I am unable to concur in the majority opinion. It holds that the power here challenged exists as a fiscal power, derived by implication from the aggregate of express powers granted to Congress. The fiscal powers relied upon to sustain the validity of the entire Act, are found in subsection (k) which was added to the original bill by the amendment of 1934. The original Act did not purport to create fiscal agents for the Government, in the sense that they were necessary to carry out any delegated power expressly granted to Congress, and its validity was attempted to be based only upon the general welfare clause. It is obvious that its dominating thought and stated purpose was to create savings and loan associations for the purpose of encouraging local mutual thrift and home-

financing institutions, but they were not to be banks of discount and deposit. These were not only to compete with state institutions of the same character, but, under subsection (i) which was held invalid (Hopkins Federal Savings & Loan Ass'n v. Cleary, 296 U.S. 315, 56 S.Ct. 235, 80 L.Ed. 251, 100 A.L.R. 1403), they were intended to supplant the state institutions even over the objections of their minority stockholders, and the state which gave them birth. It is not apparent that any relationship exists between the objects of the original bill and the fiscal powers and duties, if any, added by the amendatory subsection (k). It is obvious that the amendment was an effort merely to furnish a delegated power upon which to base the right to do that which otherwise might be unlawful.

In Linder v. United States, 268 U.S. 5, 45 S.Ct. 446, 449, 69 L.Ed. 819, 39 A.L.R. 229, the Court said:

" * * * Congress cannot, under the pretext of executing delegated power, pass laws for the accomplishment of objects not entrusted to the Federal Government. And we accept as established doctrine that any provision of an act of Congress ostensibly enacted under power granted by the Constitution, not naturally and reasonably adapted to the effective exercise of such power but solely to the achievement of something plainly within power reserved to the States, is invalid and cannot be enforced. * * *"

In United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 316, 80 L.Ed. 477, 102 A.L.R. 914, in holding the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq., invalid, the Court said:

" * * * Beyond cavil the sole object of the legislation is to restore the purchasing power of agricultural products to a parity with that prevailing in an earlier day; * * *

" * * * The exaction cannot be wrested out of its setting, denominated an excise for raising revenue and legalized by ignoring its purpose as a mere instrumentality for bringing about a desired end. To do this would be to shut our eyes to what all others than we can see and understand. * * *

"It is an established principle that the attainment of a prohibited end may not be accomplished under the pretext of the exertion of powers which are granted."

That the amendment with respect to fiscal powers is a mere pretext to accomplish that which otherwise may be prohibited, is supported by the language of subsection (k) which is the only part of the enactment mentioning fiscal agents. The creation of these agencies is merely permissive at the will of the Secretary of the Treasury, and no necessity for additional fiscal agents is disclosed either by the enactment, or by counsel. This of itself, of course, would not render the law invalid, but it should be considered together with all the other circumstances, in discovering the intention of Congress.

In support of this contention appellee relies upon Smith v. Kansas City Title & Trust Company, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577, and other cases, more or less analogous: McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579, Osborn v. United States Bank, 9 Wheat. 738, 6 L.Ed. 204, and Farmers' & Mechanics' National Bank v. Dearing, 91 U.S. 29, 23 L.Ed. 196. In all of these cases Congress merely enacted means through which it actually and directly exercised at least one of its expressly enumerated powers, that is to say it created banks through which it directly exercised the power to borrow money on the credit of the United States.

The Kansas City Case involved the right of Congress to establish Federal Loan Banks and Joint Stock Land Banks, pursuant to the Federal Farm Loan Act, 12 U.S.C.A. § 641 et seq. Section 5 of that Act, 12 U.S.C.A. § 697, required that a Federal Land Bank should invest not less than five per cent of its capital in United States bonds, the exercise of the Government's expressed power to borrow money. Section 6, 12 U.S.C.A. § 701, provided that such banks, under certain conditions, should be depositories of public money, excepting receipts from customs, thus becoming a part of the United States Treasury. Section 13, paragraph 8, 12 U.S.C.A. § 781, par. 8, provided that they should have power to buy and sell United States bonds, thus becoming an agency for the disposition of Government bonds. It is clear that Congress, in this Act, had exercised an express delegated power, and, as the end was legitimate and the means reasonable, it had acted within the scope of the Constitution. In sustaining the Act the Court based its conclusion on the fact that the banks were required to invest in Government bonds and were made Government depositories. The Court said:

"We, therefore, conclude that the creation of these banks, and the grant of authority to them to act for the Government as depositaries of public moneys and purchasers of Government bonds brings them within the creative power of Congress although they may be intended, in connection with other privileges and duties, to facilitate the making of loans upon farm security at low rates of interest, * * *"

Under these circumstances, when it was urged that the attempt to create these federal agencies, and make the banks fiscal agents and public depositories of the Government, was but a pretext, the Court said:

"* * * when Congress acts *within the limits of its constitutional authority*, it is not the province of the judicial branch of the Government to question its motives." (Our italics.)

Under the Act here involved no bank is created or authorized, and banking powers are expressly denied to the institutions sought to be established. It is obvious that the Act is not in aid of the Government's power to borrow money. No question is raised as to the scope of the war power, or of the power of eminent domain, or of the power to regulate transactions affecting interstate or foreign commerce. Indeed, no express power under the Constitution, save that of the general welfare clause, has been suggested as a basis to support the fiscal powers referred to in the enactment. Likewise, the fiscal powers and duties created do not in any manner affect the institution and operation of the Building and Savings Associations authorized under the Act. They are entirely separate and either can function or be eliminated, without the least effect upon the other. Wisconsin is not complaining of the creation of as many fiscal agents as Congress may deem necessary or proper. Its complaint is that these so-called fiscal agencies have been given power to commit acts, not related to the Government's fiscal powers, in violation of Wisconsin's laws relating entirely to its local affairs. These federal corporations might be created for the sole purpose of performing all the fiscal duties set forth in subsection (k), and if they did not attempt or threaten to do a building and loan business in Wisconsin, we assume she would not urge the objections here presented. Whether under such

circumstances she would be in a position to question the Government's right to create the corporations and have them perform the unrelated fiscal duties only, is not here presented. I think that subsection (k) adds nothing to the validity of the Act.

The only other delegated power upon which appellee seeks to base the validity of the enactment is the general welfare clause, which provides that Congress shall have power to lay and collect taxes to provide for the general welfare of the United States, which of course implies the power, to spend, for the same purpose, the money so collected. The power to tax and spend is said to be a separate and distinct power, and its exercise is not confined to the fields committed to Congress by the other enumerated grants of power. This was Mr. Hamilton's view, after the adoption of the Constitution, and it is said to have been adopted by the Supreme Court. United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. In that case the Court said: (page 320):

" * * * Every presumption is to be indulged in favor of faithful compliance by Congress with the mandates of the fundamental law. Courts are reluctant to adjudge any statute in contravention of them. But, under our frame of government, no other place is provided where the citizen may be heard to urge that the law fails to conform to the limits set upon the use of a granted power. When such a contention comes here we naturally require a showing that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress. * * * But, despite the breadth of the legislative discretion, our duty to hear and to render judgment remains. If the statute plainly violates the stated principle of the Constitution we must so declare."

In that case the Government conceded, and the Court held, that the phrase "to provide for the general welfare" qualified the power "to lay and collect taxes," and the Court said:

" * * * The view that the clause grants power to provide for the general welfare, independently of the taxing power, has never been authoritatively accepted."

In Carter v. Carter Coal Company, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, in considering the Bituminous Coal Conservation Act, 15 U.S.C.A. §§ 801–827, the Court said (page 864):

"The proposition, often advanced and as often discredited, that the power of the federal government inherently extends to purposes affecting the Nation as a whole with which the states severally cannot deal or cannot adequately deal, and the related notion that Congress, entirely apart from those powers delegated by the Constitution, may enact laws to promote the general welfare, have never been accepted but always definitely rejected by this Court."

In Helvering v. Davis, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319, the Court said (page 908):

"Congress may spend money in aid of the 'general welfare.' Constitution, Art. 1, § 8; United States v. Butler, 297 U.S. 1, 65, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914; Steward Machine Co. v. Davis, supra. *There have been great statesmen in our history who have stood for other views.* We will not resurrect the contest. It is now settled by decision. United States v. Butler, supra. The conception of the spending power advocated by Hamilton and strongly reinforced by Story has prevailed over that of Madison, which has not been lacking in adherents. Yet difficulties are left when the power is conceded. The line must still be drawn between one welfare and another, between particular and general. Where this shall be placed cannot be known through a formula in advance of the event. There is a middle ground or certainly a penumbra in which discretion is at large. The discretion, however, is not confided to the courts. The discretion belongs to Congress, *unless the choice is clearly wrong; a display of arbitrary power, not an exercise of judgment.*" (Our italics.)

It seems clear that in both United States v. Butler, and Helvering v. Davis, the Court proceeded on the theory that the language of the "general welfare clause" was ambiguous. In the Butler Case the Court, in construing that language to effectuate the intent of the instrument, said that since the foundation of the Nation sharp differences of opinion had persisted as to the true interpretation of the phrase. It said:

" * * * Madison asserted it amounted to no more than a reference to the other powers enumerated in the subsequent clauses of the same section; that, as the United

States is a government of limited and enumerated powers, the grant of power to tax and spend for the general national welfare must be confined to the enumerated legislative fields committed to the Congress. * * * Hamilton, on the other hand, maintained the clause confers a power separate and distinct from those later enumerated, is not restricted in meaning by the grant of them, and Congress consequently has a substantive power to tax and to appropriate, limited only by the requirement that it shall be exercised to provide for the general welfare of the United States. Each contention has had the support of those whose views are entitled to weight. This court has noticed the question, but has never found it necessary to decide which is the true construction."

The Court then proceeds to decide that question by adopting the Hamiltonian position as supported by Mr. Justice Story. The main question presented, however, as stated in the first sentence of the opinion, was "whether certain provisions of the Agricultural Adjustment Act, 1933, conflict with the Federal Constitution." U.S. C.A. Const. art. 1, par. 8. The Court held there was such conflict and that the challenged portions of the Act were invalid, regardless of whether Hamilton's or Madison's interpretation were adopted. That is to say the Government did not contend they were valid under Madison's position, and it is clear that if they were valid under any theory, it must be that of Hamilton. If I am correct in this conclusion, then it is quite perplexing to determine why it was necessary in the decision of the case for the Court to adopt either Hamilton's or Madison's theory. If it was unnecessary then it is the same as if the Court had not spoken on that question. See Pokora v. Wabash Railway Co., 292 U.S. 98, 54 S.Ct. 580, 78 L.Ed. 1149, 91 A.L.R. 1049. In such a case, as I understand the law, it is altogether proper for an inferior court, or any of its members, to suggest the same question to the appellate tribunal at any subsequent opportune time, provided there appears to be a reasonable ground for a reconsideration, and the suggestion is not a captious one.

I have no quarrel with the Supreme Court's determination to accept Hamilton's interpretation, if based on the facts set forth in the Butler opinion. However, there are certain undeniable historical facts, not referred to in the opinion, of which no court could consistently fail to take judicial notice if brought to its attention, and which, in my opinion, conclusively demonstrate that Madison's interpretation was that of the Constitutional Convention, including Hamilton, and also that of the citizens who voted on the question of adoption.

Mr. Madison interpreted the general welfare clause to mean that its exercise was confined to the fields committed to Congress by the other enumerated grants of power. Federalist, Essay XLI. He said this interpretation was intended by the framers, of which body he and Hamilton were members. An interesting fact is that this essay was subscribed by Hamilton, Madison and Jay; that is to say, it was subscribed "Publius," the name which each of the authors adopted in subscribing each of the essays. At this time the adoption of the Constitution was in grave doubt. The general welfare clause was one which gave great, if not most, concern. Those who were jealous of the prestige and power of the states vigorously opposed it because they were fearful of a construction of it which would extend the powers of the federal government beyond those powers specifically enumerated in the subsequent clauses. It was under these circumstances that Essay XLI was written by Madison, with the knowledge and assent of both Hamilton and Jay. It was written for the purpose of securing support for the adoption, and we find not a word of opposition to Madison's interpretation of the framers' intention until after the Constitution was adopted. There is much reason to believe that this interpretation of the general welfare clause was as influential in securing the adoption of the Constitution as any other one thing. It is said that Hamilton expressed a different interpretation of it in his state paper "Manufactures," and that his interpretation was accepted by Justice Story. This is no doubt true, but their interpretations were given several years after the Constitution was adopted. Hamilton's interpretation was communicated to the House of Representatives on December 5, 1791. Justice Story was about eight years of age when the Constitution was adopted, and it was forty-six years thereafter that he wrote his "Commentaries" in which he approved Hamilton's interpretation. Neither Hamilton nor Story, however, at any time, so far as I have been able to ascertain, purported to

say that the intention of the framers was different from the interpretation given by Madison. Having acquiesced in Madison's interpretation when the adoption was in issue, Mr. Hamilton's views to the contrary ought not to be controlling after the adoption. When construing ambiguous language we are primarily concerned with the intention of the parties who used it, rather than the interpretation of those who subsequently read it. It is not a question of modern thought nor of progressive vision, it is a question of honor. If courts can ascertain the lawmakers' intention it is their duty to follow it (Foster v. United State, 303 U.S. 118, 58 S.Ct. 424, 82 L. Ed. ——), provided always there is an ambiguity in the language used. This we apprehend is as applicable to the makers of our fundamental law as it is to statutory enactments, and it is binding on courts and Congress alike. So far as we are informed Madison is the only witness whose testimony prior to the adoption is preserved, in relation to the Convention's intention with respect to the general welfare clause. There may be other such testimony, but it is not relied upon in the decided cases. Certainly there is none other more worthy of belief, and it enjoys the distinction of having been approved by both Hamilton and Jay, and questioned by no one, prior to the adoption, except those who were fearful of subsequent legal construction to the contrary.

It is said that Madison's interpretation would result in mere tautology. Such a suggestion is aways to be considered when construing ambiguous language. Madison anticipated this criticism, however, and said that the tautology was used, according to well-known custom, for emphasis merely. Moreover, history informs us that the founding fathers did not consider tautology a grievous sin, for most of the first ten amendments were tautological in effect, and were consented to almost unanimously out of an abundance of precaution, for the purpose of emphasis, and to keep faith with those who demanded them at the time the Constitution was adopted, and to whom a promise was given to add them later.

In the Butler Case the Court noted that even with the adoption of the broader, or Hamiltonian construction of the clause, it was still subject to limitation, that is to say, the powers of taxation and appropriation extend only to matters of national, as distinguished from local welfare, citing Hamilton, Story and Monroe. With respect to this limitation appellants urge that the object sought to be accomplished by the Act is purely local and not of a national character, hence they say the enactment exceeded the powers of Congress under the tenth amendment. I think this contention should prevail.

In the past the organization and conduct of building and loan associations have been considered and treated as local, and have been attended with remarkable success so long as the citizens were home-minded, and were able and inclined to pay their dues. Each state had its own laws governing such institutions according to the needs of the respective states, and in many instances they are quite different, because local conditions are different. It is not claimed that Wisconsin, in her legislation on this subject, has been lax in protecting the interests and needs of her savings and loan patrons. She has placed the supervision of such institutions in charge of her banking Commission with adequate power to protect them, and has wisely given that Commission power to issue or deny certificates to those desiring to engage in that business. Such corporations are quasi-public in their character, and for the past sixty years their conduct in Wisconsin under the state laws, so far as this record discloses, has been beyond reproach. It is no doubt true that during the last several years their loan funds have been much depleted by the inability of their members to pay their dues, but in order to remedy this condition Wisconsin promptly enacted legislation authorizing such associations to fully cooperate with the federal government in securing temporary loans, when needed. She has never objected to her associations receiving aid from the federal government, but her objection is urged to the federal government incorporating such institutions under the Act in question and authorizing them to do business in Wisconsin in competition with her own institutions, and in violation of the Wisconsin laws. The objection seems not to be directed to relief from the federal government, when needed, but to the manner in which it is attempted to be given.

I think the contention is sound, and that the relief sought to be extended by the Act is local rather than national. Here we have a sovereign state objecting not only on that ground but on the further ground

that the relief as extended is not necessary, and is in violation of her laws. Her determination as to lack of necessity should be given great weight, and if that determination is correct, and there is a necessity for relief in other states, it would support the conclusion that the question is local rather than national.

Even though there were necessity for such local relief in each state, that of itself would not support the enactment.

"* * * It does not help to declare that local conditions throughout the nation have created a situation of national concern; for this is but to say that whenever there is a widespread similarity of local conditions, Congress may ignore constitutional limitations upon its own powers and usurp those reserved to the states. * * *" United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 323, 80 L.Ed. 477, 102 A.L.R. 914.

Many cases have been cited and discussed by counsel, but they relate to Acts based on other express Constitutional powers and their implications, and not on the right to tax for the general welfare.

I think the court erred in its conclusions of law and in its decree, and that the cause should be reversed with instructions to dissolve the injunction and dismiss the action for want of equity.