Nathan WOLFSON et al., Plaintiffs,

v.

ARTISANS SAVINGS BANK et al., Defendants.

Civ. A. No. 76–179.

United States District Court, D. Delaware.

March 24, 1977.

Frederick Knecht, Jr., Knecht, Greenstein & Berkowitz, Wilmington, Del., Arnold Levin and Gordon Gelfond, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for plaintiffs.

David A. Eastburn, Wilmington, Del., for Artisans Sav. Bank.

Rodney M. Layton and Wendell Fenton, Richards, Layton & Finger, Wilmington, Del., for Wilmington Trust Co. and Sussex Trust Co.

Charles F. Richards, Jr. and Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del., for Farmers Bank of the State of Delaware and Colonial Nat. Bank.

David S. Keil, Keil & Keil, Wilmington, Del., and Joseph S. Flowers, Wilmington, Del., for Home Federal Sav. and Loan Assn.

James M. Tunnell, Jr., William H. Sudell, Jr. and Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Wilmington Sav. Fund Society.

Frank J. Miller, Miller & Foulk, Wilmington, Del., for First Federal Sav. and Loan Assn.

Robert V. Huber, Wilmington, Del., for Ninth Ward Sav. and Loan Assn.

## OPINION

STAPLETON, District Judge:

In this action, the plaintiffs are suing nine banks, trust companies and savings and loan associations[1] in the State of Delaware that are in the mortgage loan business.[2] Five separate counts are listed in the complaint involving claims under the antitrust laws, the Truth in Lending Act, Delaware state law and, as to several of the defendants, the Home Owners' Loan Act. Each of the claims relates to the alleged practice of the defendants of requiring mortgagors to prepay to the mortgagee on a monthly basis charges for taxes, insurance and assessments. It is alleged that the prepaid funds, so-called "escrow funds", are collected by the banks for payment to the insurance companies and taxing jurisdictions as they become due but, in the interim, the banks have the use of the funds on which they pay no interest.

Eight of the defendant banks have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment. The last defendant, Ninth Ward Savings and Loan Association (hereinafter "Ninth Ward"), has moved to be dropped from the case or to have the claims against it severed pursuant to Rule 21. Similar suits have been filed on behalf of different plaintiffs in courts around the country and, thus, many of the issues raised have already received careful judicial consideration. Those can be handled with dispatch. The federal antitrust claims which are the heart of the lawsuit require more analysis and they will be treated last.

## I. TRUTH–IN–LENDING CLAIMS.

■ Count two of the complaint enumerates a variety of ways in which the mort-

---

1. For purposes of convenience, hereafter the defendants will be referred to generically as banks except with respect to those issues in which the particular status of the lending institution may have a bearing on the outcome of the issue.

2. This is brought as a class action but no class has been certified at this point.

gage practices of the defendants are alleged to violate the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* The Third Circuit considered and rejected virtually identical claims in *Stavrides v. Mellon National,* 487 F.2d 953 (1973). As the plaintiffs acknowledge, I am bound by that holding and it is dispositive of the claims here. Count two will be dismissed.

## II. DELAWARE ANTITRUST LAW.

■ Plaintiffs assert that the facts they allege constitute a combination in restraint of trade which violates Delaware antitrust and conspiracy statutes. They give no citations to statutes but this is not surprising since Delaware has no antitrust laws. Count three will likewise be dismissed for failure to state a claim.

## III. COMMON LAW.

■ Count four raises a claim of unjust enrichment apparently based on the theory that the clauses of the mortgage agreements requiring the prepayment of taxes and insurance create either an express or a constructive trust of the prepaid funds. This is a state law claim and, if this Court is to hear it, it must do so as an exercise of its pendent jurisdiction. Questions of pendent jurisdiction raise two issues. First, does the Court have the power to adjudicate the claim, that is, is the claim truly pendent? Second, if the power exists, is the case one in which considerations of judicial economy, convenience and fairness to the parties justify the Court's exercising its discretion to hear the pendent claim? *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

■ In *United Mine Workers,* the Supreme Court observed that, to decide whether a particular claim is pendent, the District Court must determine whether the state and federal claims derive from "a common nucleus of operative fact". Here, in order to evaluate the merits of the trust claim, the Court would have to analyze the terms of the individual mortgage agreements each of the defendants uses in its business. Once the Truth-in-Lending claims have been dismissed, the mortgage agreements are not part of the body of operative fact placed before the Court by virtue of the federal claims. Thus, without the necessary commonality of factual issues, the Court has no power to hear count four. But even leaving aside for a moment the question of power, this is not an appropriate case for the exercise of pendent jurisdiction.

*United Mine Workers, supra,* at 726, 86 S.Ct. at 1139 cautioned:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of the applicable law.

The plaintiffs have filed precisely the same lawsuit in the Delaware Chancery Court. The interests of judicial economy, convenience and fairness to the parties that the Supreme Court has directed District Courts to consider militate against this Court contemporaneously ruling on the same matter.[3] Count four will be dismissed without prejudice.

## IV. HOME OWNERS' LOAN ACT OF 1933.

In their fifth cause of action, plaintiffs charge that, "[b]y virtue of the . . . acts and practices [complained of], defendant Savings and Loan Associations have improperly collected escrows in excess of disbursements for taxes, insurance, water rents and sewerage payments . . . ." It is alleged that this is a violation of the Home Owners' Loan Act, 12 U.S.C. § 1461, *et seq.*

■ The only defendant affected by this charge is First Federal Savings and Loan Association. Home Federal is the only other federally chartered savings and loan association governed by the Act and it has had no mortgage dealings with any of the plaintiffs. With respect to a claim such as

---

**3.** *See Kinee v. Abraham Lincoln Federal Savings and Loan Ass'n,* 365 F.Supp. 975 (E.D.Pa. 1973).

this, which does not have a conspiracy element to it, plaintiffs have no standing against a bank with whom they have not transacted business. Plaintiffs' fifth cause of action will be dismissed as to Home Federal.

First Federal asserts that the Chandlers, the plaintiffs who do have a mortgage with First Federal, have never been required to make monthly payments in excess of one-twelfth of the annual charges for taxes and insurance and, thus, have not been overcharged. However, the bank has not submitted adequate affidavit documentation of its assertion. On this state of the record, I cannot grant summary judgment to First Federal on count five. First Federal does not contend, as Home Federal did, that there is no private cause of action under the Home Owners' Loan Act. Accordingly, I do not decide that question.[4]

## V. FEDERAL ANTITRUST CLAIMS.

Plaintiffs charge the defendants with a three part conspiracy in restraint of trade. They allege that the banks have conspired to require mortgagors to prepay taxes and insurance,[5] to refuse to pay interest on the prepaid "escrow" funds and, finally, to "tie" the extension of escrow services to the extension of a mortgage loan.[6] Summary judgment must be entered against the Wolfsons because the undisputed facts of record show that they do not have a claim which entitles them to relief. The Chandlers, on the other hand, have adequately alleged a violation of the antitrust laws and disposition of defendants' motion for summary judgment will be deferred pending the discovery which these plaintiffs have requested regarding those issues pursuant to Rule 56(f).

### A. The Wolfson Mortgage.

The complaint recites that the Wolfsons have a mortgage with the Wilmington Trust Company. Wilmington Trust has responded with documentary evidence showing that this is not the case. According to Wilmington Trust's affidavits, the mortgage on the property owned by the Wolfsons is a mortgage between Richard and Bertha Bennett, mortgagors, and T. B. O'Toole, Inc., mortgagee, dated April 30, 1959. T. B. O'Toole, which is a real estate brokerage firm, assigned that mortgage to the Bowery Savings Bank of New York on the same day it was executed. Thereafter, in 1964, the Bennetts transferred the property to the Excess Insurance Corporation subject to the Bennett mortgage. In 1966, Excess Insurance transferred title to the Wolfsons, again, subject to the Bennett mortgage. Bowery Savings Bank still holds the mortgage and Wilmington Trust is the local agent that services the mortgage.

In their response to the motion for summary judgment, the plaintiffs did not dispute any of these facts and argued only that they have standing to sue based on "the assignment" of the mortgage to them.[7] Assuming as a matter of law that antitrust

---

4. The case law on this question is split. In *Milberg v. Lawrence Cedarhurst Federal Savings and Loan Ass'n*, 496 F.2d 523 (2nd Cir. 1974), the court permitted a private cause of action after the FHLBB had declined to act on a mortgagor's complaint. However, *Goldman v. First Federal Savings and Loan Ass'n of Wilmette*, 518 F.2d 1247, 1250 (7th Cir. 1975), suggests that the *Milberg* result may not be correct in light of recent Supreme Court explanations of when it is proper to infer a private cause of action to enforce federal regulations.

5. The complaint actually charges that the defendants acted in concert in changing from the "capitalization" method to the "escrow" method for covering tax and insurance charges on mortgaged property. Affidavits submitted by the defendants show that they have never used the capitalization method. Nevertheless, generously construed, the complaint can be read to charge a conspiracy to require escrowing and not to permit capitalization. *See Kinee, supra,* at 980.

6. The first and third facets are, of course, factually related, but distinct legal theories are pressed by plaintiffs in support of each claim.

7. In recent supplements to their brief, plaintiffs also argue that they have standing as consumers. While I accept the proposition that consumers have standing under Section 4 of the Clayton Act, 15 U.S.C. § 15, as will be seen, the Wolfsons are not consumers of the mortgage services offered by the defendants.

claims can be assigned and assuming, further, that an assignment of a mortgage constitutes an assignment of antitrust claims theretofore held by the assignor as a result of his original mortgage transaction, the difficulty with this argument is that the Bennett mortgage has not been assigned to the Wolfsons. Wilmington Trust's records showing that the Wolfsons took their property "subject to" the Bennett mortgage stands uncontradicted. *Vis à vis* the mortgage lender, one who takes property subject to a mortgage obtains no personal rights or responsibilities on the mortgage as he or she would if there were an assignment.[8]

The Wolfsons have shown no other activities or facts that would give them a cause of action. As far as the record reveals, they have never attempted to negotiate for a mortgage. Rather, they have simply purchased property subject to a mortgage lien. The existence of the lien was reflected in the price they paid. If the terms of the mortgage had been more favorable, that fact would have been reflected in the total purchase price the Bennetts received for the property. Thus, any economic injury that has been suffered as a result of the alleged conspiracy has been suffered by the Bennetts, not the Wolfsons, and any antitrust suit arising from the mortgage would have to be brought by them. In short, the claim asserted is one which cannot be held by both couples and the documentary evidence of record refutes the assertion in the Wolfsons' brief that they received an assignment of any claim the Bennetts may have had.

### B. *The Chandler Mortgage.*

■ As noted above, the Chandlers have a mortgage on their home with First Federal Savings and Loan. Several of the terms of that mortgage are dictated by federal law. The Federal Home Loan Bank Board (hereinafter "FHLBB"), whose regulations govern First Federal, requires that the es-

crow method be used as to taxes and assessments on the property when a mortgage exceeds 80% of the value of the property.[9] Undisputed affidavits of First Federal show that the Chandlers' mortgage was for 94.9% of the value of the mortgaged property. Accordingly, it may be true, as defendants contend, that the Chandlers will be unable to show injury even if they should succeed in proving a conspiracy in the market place to require prepayment of taxes or an illegal tie between the extension of credit and escrow services. If the Chandlers were in a position to qualify for credit only at a federal savings and loan association, they would have been required to accept the arrangement which they did accept whether or not the alleged conspiracy had existed. On the present record, however, this does not require dismissal of these claims against First Federal or the other alleged members of the conspiracy. The Chandlers' theory, as I understand it, is that they were credit seekers in a market in which the defendants' alleged conspiracy had foreclosed any bargaining for a more favorable arrangement for the payment of taxes. If this be true and they would have been able to bargain for their credit elsewhere than First Federal in the market place, the Chandlers may be able to show injury from the alleged conspiracy.

■ It must also be noted that the FHLBB does not require *insurance* escrowing. Accordingly, if there has been a conspiracy with respect to that practice, the Chandlers may have been injured by it. This aspect of their claim also remains alive.

### C. *Interest On Escrow Funds.*

■ Several of the defendants contend that they cannot be charged with a conspiracy to deny interest on escrow funds because governing regulations explicitly *permit,* as opposed to *require,* the banks to do this. Their argument must be rejected.

---

**8.** 4 *Pomeroy's Equity Jurisprudence* § 1205 (5th Ed.).

**9.** 12 CFR § 545.6–1(a)(4)(iii). *See also* 12 CFR § 545.6–11(a) which requires that the loan

agreement provide full protection as to insurance but does not specify that escrowing be the means used to provide that protection.

Many commercial activities which are legal, under federal regulation or otherwise, may become illegal restraints of trade if engaged in as part of a conspiracy. The Chandlers can go forward with discovery on their claim that the defendants have conspired in a refusal to award interest on escrowed taxes and insurance.

### D. *Exemption From Antitrust Laws.*

Home Federal, a federal savings and loan association, presents two grounds upon which it asserts it is immune from the antitrust laws. First, it suggests that it is an agency or instrumentality of the federal government. From that first proposition, it reasons that it is exempt from the antitrust laws under the doctrine of *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Alternatively, Home Federal argues that, insofar as the heavily regulated escrowing practices are concerned,[10] the Home Owners' Loan Act and regulations thereunder work an implied repeal of the antitrust laws. In the context of the claims in this case, both these contentions must fail.

#### 1. *Agency or Instrumentality.*

■ There are numerous cases in which courts have held that federal savings and loan associations are agencies or instrumentalities of the federal government. The cases have arisen in a wide variety of contexts. For example, in *United States v. Harper,* 241 F.2d 103 (7th Cir. 1957), the court so held in the course of rejecting a criminal defendant's challenge to federal jurisdiction over the prosecution of a robbery of a federal savings and loan association. More commonly, the argument has succeeded when states or citizens of states have attempted to subject the associations to state banking laws, that is, in cases where the issue was federal preemption of state control over financial institutions. *See, e. g., First Federal Savings and Loan Association v. Loomis,* 97 F.2d 831 (7th Cir.

1938); *Rettig v. Arlington Heights Federal Savings and Loan Association,* 405 F.Supp. 819, 823 (N.D.Ill.1975). Unfortunately, these cases provide little guidance in the analysis of whether savings and loan associations have sufficient nexus with the federal government to require a blanket exemption from the antitrust laws.

The language of the statute also lends some support to Home Federal's contention:

> When designated for that purpose by the Secretary of the Treasury, and Federal savings and loan association . . . may be employed as fiscal agent of the Government under such regulations as may be prescribed by said Secretary and shall perform all such reasonable duties as fiscal agent of the Government as may be required of it. . . .

12 U.S.C. § 1464(k). The *Loomis* case cited above noted that, pursuant to this provision, federal savings and loan associations might be called upon to sell United States Savings Bonds, to act as collection agent for delinquent accounts arising from transactions under the National Housing Act, 12 U.S.C. § 1701, *et seq.,* and to service loans and properties of the Home Owners Loan Corporation. 97 F.2d, at 837. Again, knowing that the associations have these added powers and duties does not further the inquiry into whether the agency role extends far enough to give the associations governmental status for purposes of antitrust regulation. That can best be discovered by looking at the organization and operation of these institutions.

The creation of a federal savings and loan association can be initiated by private citizens of "good character and responsibility." [11] Once establishment of an association receives federal approval, a board of directors composed of private citizens is elected by the subscribers, also private citizens, who have invested their money to found the association.[12] The board of directors is then responsible for the operation of the association. These elements of

---

**10.** *See, e. g.,* 12 CFR §§ 545.6 and 555.2 (1976).

**11.** 12 CFR § 543.2 (1976).

**12.** 12 CFR § 543.6 (1976). The government may make some limited investments in an association. 12 U.S.C. § 1464(g) and (j).

private ownership and operation are not the ordinary indicia of a federal agency and do not support defendant's *Parker v. Brown* contention.

As plaintiffs stress, it has been said that the comprehensive FHLBB rules and regulations cover "all aspects of every federal savings and loan association 'from its cradle to its corporate grave'." *Meyers v. Beverly Hills Federal Savings and Loan Association,* 499 F.2d 1145, 1147 (9th Cir. 1974). Yet, no matter how extensive the regulation, regulation alone does not turn a privately owned and operated association into an arm of the federal government.[13] The level of regulation may lead to the conclusion that there has been an implied repeal of the antitrust laws, however, and I will now turn to that issue.

### 2. *Implied Repeal.*

■ Home Federal argues that Congress has subjected federal savings and loan associations to such intense regulation that, by implication, it has expressed the intent that they should not be governed by the antitrust statutes as well. Moreover, Home Federal asserts that even if there has not been a general repeal, there is a repeal insofar as the activities plaintiffs challenge are concerned because these activities are regulated in even greater detail than other activities of the associations.

A like argument was made and rejected in *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), with respect to federally chartered national banks. The court acknowledged that the banks were regulated heavily by a variety of federal agencies,[14]

and that even the very merger that was the subject of the lawsuit had been reviewed by the Comptroller of the Currency pursuant to the Bank Merger Act.[15] Nevertheless, the court found no implied repeal commenting:[16]

> The fact that the banking agencies maintain a close surveillance of the industry with a view toward preventing unsound practices that might impair liquidity or lead to insolvency does not make federal banking regulation all-pervasive, although it does minimize the hazards of intense competition. Indeed, that there are so many direct public controls over unsound competitive practices in the industry refutes the argument that private controls of competition are necessary in the public interest and ought therefore to be immune from scrutiny under the antitrust laws.

This philosophy has been reaffirmed recently in the context of another highly regulated industry, the electrical utility business. The Supreme Court reiterated the standard by which immunity claims are judged:[17]

> "Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system."

The court emphasized that the relevant aspect of the regulatory agency's jurisdiction must be sufficiently central to the purposes of the enabling statute so that implied repeal is necessary to make the regulatory scheme work.[18]

Home Federal has not shown any clear repugnancy between the antitrust laws and

---

**13.** A comparison of the governing federal law convinces me that the relationship of federal savings and loan associations to the federal government does not materially differ from that of national banks. See 12 U.S.C. § 21, *et seq.* The Supreme Court decided by necessary implication in *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) that national banks enjoy no blanket immunity from operation of the federal antitrust laws.

**14.** 374 U.S., at 327–30, 83 S.Ct. 1715.

**15.** 12 U.S.C. § 1828(c).

**16.** 374 U.S., at 352, 83 S.Ct. at 1736.

**17.** *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), quoting from *United States v. National Association of Securities Dealers,* 422 U.S. 694, 720–21, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).

**18.** *Id.*

the system of FHLBB regulation implicated in this lawsuit. It appears that the FHLBB regulatory scheme for federal savings and loan associations does not concern itself at all with attempting to affect, either positively or negatively, the competitive conditions in the banking field. Indeed, subjecting member associations to the antitrust laws may further the object of the Home Owners' Loan Act of providing for the sound and economical financing of homes by encouraging federal savings and loan associations to vie energetically with other financial institutions for home mortgage business. The mere fact that the FHLBB permits some of the challenged practices does not make those practices a matter of federal policy. I find no implied repeal of the Sherman and Clayton Acts in the context of this case.

### VI. NINTH WARD'S MOTION.

As noted earlier, defendant Ninth Ward has moved the Court to drop it from this case or to sever the claims against it for separate trial. In support of its motion, Ninth Ward argues that it is not involved in interstate commerce and is thus beyond the reach of the federal antitrust laws.

In order to subject a defendant to antitrust liability the plaintiff must show that the defendant is engaged in interstate commerce or that the activities alleged to constitute an illegal restraint of trade substantially affect interstate commerce. *See, e. g., United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Ninth Ward has submitted affidavit testimony that all of its depositors and borrowers are from within the State of Delaware, that all of the property on which it has mortgages is in Delaware, and that it carries no mortgages insured by the Veterans Administration or by the Federal Housing Administration. These facts certainly lend support to its contention that it does not, by its own activities, affect interstate commerce. Nevertheless, the Court cannot say on the basis of the current record that the

plaintiffs will not be able to prove that there has been a conspiracy, that Ninth Ward has participated in it and that the total effect of the conspiracy has had a substantial impact on interstate commerce. If all of these are established, Ninth Ward may be liable for violating the antitrust laws.[19] Accordingly, Ninth Ward's motion will be denied.

Submit order.

---

**19.** *Cf. Goldfarb v. Virginia State Bar,* 421 U.S. 773, 783–85, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Brett v. First Federal Savings and Loan Ass'n,* 461 F.2d 1155 (5th Cir. 1972).